IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No.:   1:20-cv-3685

ROBERT WETZEL,

    Plaintiff,

v.

THE CITY OF GLENDALE.
.

    Defendants.

## COMPLAINT AND JURY DEMAND

Plaintiff, Robert Wetzel, (hereinafter "Wetzel" or "Plaintiff"), by and through his undersigned attorney, brings this action and alleges as follows:

## JURISDICTION & VENUE

1. This action arises under the Constitution and laws of the United States and 42 U.S.C. § 12101 et seq. (ADA), and 42 U.S.C. § 1983. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. §§ 1331 and 1343.

2. Venue in the United States District Court is proper in that the action complained of took place in the State of Colorado, and all the parties are residents of the state.

## PARTIES

3. At all pertinent times mentioned herein, Wetzel, was and is a citizen of the United States of America and a resident of Colorado.

4. The City of Glendale is a municipality in the State of Colorado.

5. All acts taken by the Defendants were taken under color of law, ordinance,

1

custom, practice and usage.

## FACTUAL ALLEGATIONS

6. Prior to being in law enforcement, from June 24, 2003 through February 10, 2010, Wetzel served in the United State Air Force.

7. While serving in the military, Wetzel suffered from a mild traumatic brain injury without loss of consciousness from an IED in 2006.

8. Ultimately, Wetzel was honorably discharged from the military.

9. After his military career, Wetzel became a law enforcement officer.

10. On March 14, 2016, Wetzel was hired as a Police Officer with the Glendale Police Department.

11. Prior to being hired with the Glendale Police Department, Wetzel had to undergo a physical and mental evaluation. Should Wetzel have failed those examinations he would not have been offered employment as a law enforcement officer.

12. Wetzel passed by the physical and mental evaluation.

13. For 7 ½ months, Wetzel performed the full duties as a Police Officer with the Glendale Police Department with no issues.

14. In November 2016, Wetzel experienced a Gran Mal Seizure. This event placed Wetzel on leave under the Family Medical Leave Act ("FMLA").

15. As a result of the seizure, Wetzel was seen by neurologist, Dr. Michael Pearlman at Blue Sky Neurology.

16. Dr. Pearlman had Wetzel undergo an MRI which was abnormal due to a showing of some swelling versus mass in the left frontal lobe. However, follow-up imaging did not show evidence of any further abnormalities in the left upper lobe or

elsewhere.

17. After approximately one week from the initial episode, Wetzel did suffer from generalized tonic-clonic seizures and less than a dozen petit mal seizure episodes; however, after those limited events Wetzel had no further seizures.

18. Wetzel was treated for several months with various antiepileptic drugs, which drugs were ultimately discontinued as Wetzel had no further seizure events.

19. In February 2017, Wetzel was removed from FMLA leave and returned to work in a light duty capacity.

20. Wetzel remained on light duty until he underwent a fitness for duty evaluation through the Glendale Police Department.

21. In August 2017, Wetzel underwent the fitness for duty testing with a Neuropsychologist. Ultimately, Wetzel was cleared to return to work.

22. In September 2017, Wetzel returned to full active duty with the Glendale Police Department with no restrictions.

23. In May 2018, Wetzel was involved in an arrest of a suspect that resulted in a struggle. During that struggle, Wetzel hit his head on a curb.

24. On May 10, 2018, Wetzel was admitted to HealthOne Rose Medical Center.

25. While at HealthOne Rose Medical Center, Wetzel was treated by Dr. James Kelly.

26. At the time of his admission, the admission diagnoses was: possible cerebral thrombosis, status post thrombolytic therapy, possible seizure with potential Todd's paralysis, history of seizure disorder, history of small T2 hyperintense lesion in the left frontal lobe, remote history of traumatic brain injury, hypertension and status post recent

altercation in the workplace.

27. Wetzel was discharged from HealthOne Rose Medical Center on May 11, 2018.

28. Notable to Wetzel discharge diagnoses was a probable atypical migraine, no evidence of cerebral thrombosis clinically or on neuroimaging; stroke rule out and no evidence of seizure activity. Additionally, the EEG was entirely normal. There was no neuroanatomical lesions identified on any of Wetzel's imaging studies.

29. On May 15, 2018, Wetzel again saw Dr. Pearlman to examine the recent head injury. Dr. Pearlman continued with Zoloft, Zofran and ibuprofen.

30. On May 18, 2018, Dr. Pearlman drafted a letter stating: "Robert Wetzel is currently under my treatment for a neurological condition and may return to work May 21, 2018 with no restrictions." (Attached hereto as **Exhibit A** is a copy of Dr. Pearlman's May 18, 2018 letter).

31. On or about May 18, 2018, Wetzel delivered Dr. Pearlman's letter to the Glendale Police Department.

32. Despite receipt of Dr. Pearlman's letter, Glendale Police Department did not allow Wetzel to return to work.

33. On or about June 18, 2018 and July 16, 2018, Wetzel had routine follow-ups with Dr. Pearlman. Dr. Pearlman did not alter or change Wetzel's treatment since the May 15th evaluation. However, Dr. Pearlman did refer Wetzel to the Marcus Institute for Brain Health at University Hospital.

34. Marcus Institute for Brain Health at University Hospital provides treatment for mild-to-moderate brain injuries, specifically, for military Veterans.

35. Wetzel went to the Marcus Institute for Brain Health at University Hospital from August 20, 2018 through August 22, 2018.

36. The Marcus Institute for Brain Health at University Hospital recommended inpatient treatment for Wetzel to treat his PTSD diagnosis.

37. Wetzel did enter inpatient treatment at the VA Hospital in Colorado. Wetzel received treatment for PTSD from October 4, 2018 through November 21, 2018.

38. After his treatment at the VA Hospital and a Marcus Institute, Wetzel had marked improvement since the PTSD diagnosis.

39. On November 1, 2018, Wetzel was evaluated by Dr. Stanley Ginsburg. Dr. Ginsburg was retained by the City of Glendale to exam whether Wetzel was fit for duty.

40. Dr. Ginsburg stated that he would hesitate to have Wetzel back "on the street" as a law enforcement officer. Dr. Ginsburg's assessment was based, in part, on convulsive activity "perhaps" and pseudoseizures.

41. Subsequent to this evaluation, Wetzel saw Dr. Pearlman on November 5, 2018. During that visit Dr. Pearlman noted improvement since Wetzel entered the PTSD rehabilitation. Dr. Pearlman kept Wetzel on Torkendi, which was used to decrease Wetzel's headaches.

42. Following the November 5th Dr. Pearlman visit, Wetzel was evaluated by Dr. David Reinhard. Dr. Reinhard engaged in an Independent Medical Evaluation on December 21, 2018. This evaluation was based on Wetzel's worker's compensation claim following the May 2018 incident where Wetzel was injured during the arrest of a suspect.

43. Dr. Reinhard diagnostic impression was that Wetzel had a concussion from the May 8, 2018 incident. Dr. Reinhard further found that there was evidence for post-

traumatic migraine headaches secondary to the concussion. He also felt that there was evidence for a cognitive disorder as related to the concussion.

44. Where Dr. Reinhard made diagnostic finding, as identified in paragraph 43 herein, he did not conclude a seizure disorder. To the contrary, Dr. Reinhard found: "[t]here is a past history of seizures of about a week's duration, followed by several months of being on antiepileptic medication. Those episodes, which did involve two generalized tonic-clonic seizures, appear to have resolved, as they have not recurred since 2016, even off his antiepileptic medication. Therefore, the seizure-like episodes since [May 8, 2018] appear to be related to that injury…."

45. Following Dr. Reinhard's evaluation, which was provided to the City of Glendale in the latter part of 2018 and/or beginning of 2019, Dr. Ginsburg provided a follow-up evaluation report on January 18, 2019.

46. Dr. Ginsburg's January 18, 2019 report concluded that Wetzel should not return to work as a law enforcement officer.

47. After receiving Dr. Ginsburg's report, the City of Glendale elected to terminate Wetzel from the Glendale Police Department. The City of Glendale informed Wetzel that "he could not perform the essential functions of the police officer position and there were not reasonable accommodations available at that time…"

48. Under the City of Glendale's Policy and Procedure Manuals, Wetzel (as a Glendale employee) had the right to appeal his termination.

49. On or about February 12, 2019, Wetzel submitted his grievance/appeal to City Manager, Jerry Peters. (Attached hereto as **Exhibit B** is a copy of Wetzel's appeal).

50. Shortly after Wetzel's written appeal, Wetzel met with City Manager Peters.

6

In that meeting, Wetzel provided Peters with documentation from Dr. Pearlman stating, in part, that Wetzel is "*capable of performing the duties and requirements of the position of police officer…*."  Moreover, Dr. Pearlman stated that it would be "*safe for Officer Wetzel to be engaged in periodic physical altercations with may involve contact to the head in either field or in training…*"  Finally, Dr. Pearlman confirmed that there is no "*risk to the public, coworkers and to himself in his performing the following duties under highly stressful conditions: the driving of a police vehicle sometimes at enhanced speeds carrying/use of firearm or carrying/use of other nonlethal tools.*"

51. Despite medical documentation confirming that Wetzel can perform the job of a Glendale Police Officer, City Manager Peters upheld Wetzel's termination from the City of Glendale.

52. Subsequent to terminating Wetzel as a Police Officer, the City of Glendale attempted to place Wetzel in a position within the City that was not in a law enforcement capacity.

53. The City of Glendale offered Wetzel the position of Victim Advocate.

54. The City of Glendale's Victim Advocate job description is as follows:

The advocate "will accompany police officers to the station, hospitals or crime scenes to support victims and ensure they are treated with dignity and respect. They will provide referrals and advocate for the victims. They will assist male and female victims, and often be responsible for the care of a child until social services can take over. They may also accompany officers to make death notifications. Once trained, on-call times are generally from 5 pm to 7am (on call overnight) mostly weekends, holidays and some weekday nights. The volunteer advocate is required to take three to four "on-call" 12-hour shifts each month, to be able to respond in a timely manner from wherever they are, and have no alcohol during their shifts."

55. As a Victim Advocate, Wetzel was required to provide his own

transportation so that he could perform the above job duties as a Victim Advocate.  In regard to the transportation requirement, Wetzel was obligated to have a valid Colorado driver's license.

56. At all relevant times, Wetzel had a valid Colorado driver's license.  In addition, Wetzel's medical condition did not preclude him from operating a vehicle in the State of Colorado.

57. Where Dr. Ginsburg's fit for duty report sited concerns and restrictions regarding Wetzel driving an *emergency* vehicle, Dr. Ginsburg did not restrict Wetzel from driving a non-emergency vehicle all together.

58. Upon information and belief, there has been no restriction, medical or otherwise, prohibiting Wetzel from driving a non-emergency vehicle.

59. At all times relevant, a City of Glendale Victim Advocate does not operate an emergency vehicle.

60. Despite no restriction on driving a non-emergency vehicle, the City of Glendale required that Wetzel take an UBER in his duties as a Victim Advocate.

61. At issue with this requirement is that under the job description of a Victim Advocate, Wetzel would be required to promptly respond in "a timely manner from wherever they are…"  Where UBER may be accessible at certain times, there is no guarantee that Wetzel would be able to obtain an UBER when he is on-call and required to respond as the Victim Advocate.

62. Upon information and belief, should Wetzel fail to respond while on-call due to not being able to timely obtain a ride or transport, Wetzel may be subject to disciplinary action.

63. In short, by precluding Wetzel from driving his own vehicle the City of Glendale is setting Wetzel up for failure.

64. Upon information and belief, City Manager Peters was involved in several car accidents while he held the position of Glendale City Manager.

65. Upon information and belief, City Manager Peters was involved in several car accidents while operating a City of Glendale vehicle.

66. Upon information and belief, City Manager Peters' accidents were (or partially) caused by Peters' medical condition. However, despite Peters' "medical condition," he was not restricted from driving a City of Glendale vehicle.

67. Due to the requirement that Wetzel take an UBER as opposed to driving his own vehicle, coupled with the appearance that City of Glendale is taking an inconsistent stance with Wetzel as opposed to another City employee, Wetzel elected not to take the Victim Advocate position.

## FIRST CLAIM FOR RELIEF
(Americans with Disabilities Act – All Defendants in their Official Capacity)

68. Wetzel hereby incorporates and makes reference to each and every allegations of paragraphs 1 through 67 of the Complaint as if set forth above.

69. Wetzel was a qualified individual with a disability, as defined in the ADA. Further, at the time of his discriminatory discharge, he was able to perform all the essential functions of his job with or without reasonable accommodation.

70. Defendants failed to engage in a meaningful interactive process with Wetzel pursuant to the requirements of 29 CFR 1630.2(o), in order to determine a reasonable accommodation for Wetzel's disability and/or perceived disability.

71. Defendants intentionally, knowingly, and willfully engaged in illegal

employment practices and policies which have discriminated against Wetzel because of his disability which resulted in his termination.

72. Moreover, when offering Wetzel the position of Victim Advocate, the City of Glendale unlawfully perceived that Wetzel was disabled.

73. As a consequence of the perception that Wetzel was disabled, the City of Glendale imposed restrictions that are discriminatory in nature, which discrimination was based on Wetzel's disability and/or perceived disability.

74. As a proximate result of Defendants' actions, Wetzel has suffered loss of wages, loss of job, loss of benefits, loss of seniority, other economic losses, emotional pain, suffering, humiliation, inconvenience, emotional distress, mental anguish and loss of enjoyment of life.

WHEREFORE, Robert Wetzel respectfully requests that this Court enter judgment in his favor and against the Defendants and grant:

(a) Appropriate declaratory and/or equitable relief;

(b) Compensatory and consequential damages, including damages for emotional distress, loss of reputation, humiliation, loss of enjoyment of life, and other pain and suffering allowed by law in an amount to be determined at trial;

(c) All economic losses allowed by law;

(d) Attorney's fees and the costs associated with this action, including those associated with having to defend against the termination case;

(e) Pre- and post-judgment interest at the lawful rate;

(f) Any further relief that this court deems just and proper, and any other relief as allowed by law.

**PLAINTIFF REQUESTS A TRIAL TO A JURY ON ALL ISSUES SO TRIABLE.**

Dated: December 16, 2020

                            ELKUS & SISSON, P.C.

                By:     */s/ Reid J. Elkus*
                        Elkus & Sisson, P.C.
                        Reid J. Elkus
                        Lucas Lorenz
                        *Attorneys for Plaintiff*